LOVELL & Another *v.* ST. LOUIS MUTUAL LIFE IN-
SURANCE COMPANY & Others.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE
MIDDLE DISTRICT OF TENNESSEE.

Submitted March 14th, 1884.—Decided April 7th, 1884.

*Contract—Damages—Insurance.*

A policy of life insurance containing a provision that a default in payment of
premiums shall not work a forfeiture, but that the sum insured shall then
be reduced and commuted to the annual premiums paid, confers the right on
the assured to convert the policy at any time, by notice to the insurer, into a
paid-up policy for the amount of premiums paid.

The neglect to pay a premium on a policy of life insurance will not work a for-
feiture of the policy if the neglect was caused by a representation made in
good faith but without authority by an agent of the insurer that it would
be converted by his principal into a paid-up policy on the basis of the
premiums already paid in.

On the termination of its business by a life insurance company, and the transfer
of its assets and policies to another company, each policy holder may, if he
desires, terminate his policy and maintain an action to recover from the
assets such sum as he may be equitably entitled to.

In such case the measure of damages will be the amount of premiums paid
less the value of the insurance of which he enjoyed the benefit.

When one party to an executory contract prevents the performance of it, or
puts it out of his own power to perform it, the other party may regard it as
terminated, and demand whatever damages he has sustained thereby.
*United States* v. *Behan,* 110 U. S. 339, cited and affirmed.

This case was commenced by a bill in chancery filed by the
appellants, Lovell and wife, citizens of Tennessee, against the
St. Louis Mutual Life Insurance Company and the St. Louis
Life Insurance Company, for relief in relation to a certain
policy of insurance issued by the former company through an
agent at Nashville, Tennessee, to Lovell on his own life for the
sum of $5,000, for the benefit of his wife, and to be paid to her
on his death. The policy was dated the 24th of April, 1868,
and stipulated for the payment of an annual premium of
$162.14, payable (in the words of the instrument) as follows:
"An annual premium note of $53, and a semi-annual cash
premium of $54.57 on the 24th days of April and October, the

first one of said notes, and the first semi-annual cash premium, commencing with the date of this policy." There was a condition in the policy that if, after the payment of the first three annual premiums, a default should be made in the payment of the annual premiums thereafter to become due, then (in the words of the condition) "such default shall not work a forfeiture of this policy, but the sum of $5,000, the amount insured, shall be then commuted or reduced to the sum of the annual premiums paid." After setting out the policy the bill stated the following facts. The premiums called for by the policy were all paid down to and including the 24th of April, 1873; a new premium note being given at the end of each year, and any dividends due to the insured being credited thereon, the company being a mutual one. At, or shortly after, the last payment (which was made to one Foote, agent of the company at Louisville, Kentucky, the agency at Nashville having been discontinued), Lovell made known to Foote his desire to receive a paid-up policy for what he was entitled to, and a return of his premium note; he and the agent agreeing, as had also been represented by the agent at Nashville, on the issuing of the policy, that all the money he had paid by way of premiums (amounting to $822 less the amount of his outstanding note) would be credited to him, and that he could have a paid-up policy for such amount as that money under the regulations of the company would entitle him to if he had paid it all at once for a paid-up policy. With this view and understanding he surrendered his policy to the agent, to be transmitted to the home office at St. Louis and exchanged for a paid up policy in its stead. Lovell being engaged in steamboating on the Mississippi, gave the matter no further thought, supposing that it would be all right. But after some time, he was surprised at receiving notice to pay the interest on his note, and on going to his home he found that instead of a paid-up policy, the original policy had been returned with an indorsement on the margin in the words and figures following:

"In default of payment of renewal premium due 24th October, 1873, this policy is commuted and reduced to eight hundred and

twenty-two dollars on condition that the interest on outstanding premium notes is paid annually in advance.

" M. A. CAMPBELL, <em>Assignee.</em>"

The complainant, Lovell, went to the agent at Louisville and protested against the course of the company, and insisted that he was to have received a paid-up policy, and a return of his note; but the agent told him that since the agreement made with him for a paid-up policy the St. Louis Mutual Life Insurance Company had sold out to the Mound City Life Insurance Company (whose name was afterwards changed to the St. Louis Life Insurance Company), and that such a thing as issuing to him a paid-up policy, or even restoring or reinstating his policy, was wholly outside of the contract with the Mound City Company, and that the policy was now forfeited.

The bill charged that after the original policy was surrendered for exchange as aforesaid, without the knowledge or consent of complainant, the St. Louis Mutual Life Insurance Company sold and transferred its entire assets, name, good will, &c., to the Mound City Life Insurance Company, before any interest had accrued on his premium note. The complainant insisted that he had been guilty of no default that ought to work a forfeiture of his policy; and that the money paid by him on his policy should be refunded to him with interest, and that his outstanding note should be delivered up to be cancelled. The bill further stated that there was in the hands of William Morrow, treasurer of the State of Tennessee, $20,000 of State bonds, held as the property of the insurance company, under the laws of Tennessee, as indemnity against loss to citizens of Tennessee on life policies such as that of complainant; he therefore prayed for an attachment and an injunction to hold said fund subject to the orders of the court, until the claim of the complainant should be satisfied. The bill concluded with a prayer for general relief.

An attachment and injunction were issued as prayed, and the defendants appeared and answered the bill.

The answer did not question the material averments of the bill, and admitted that the affairs of the St. Louis Mutual Life

Insurance Company having become greatly embarrassed, on the 7th of October, 1873, the superintendent of the Insurance Department of the State of Missouri filed in the Circuit Court of St. Louis County a petition setting forth that the company was insolvent and praying for an injunction against its carrying on the business further, and that such an injunction was issued; and that, in due course, the court pronounced the company insolvent and restrained it from reinsuring its risks without the order and consent of the court. What further took place in reference to the affairs of the company is shown by the following extracts from the joint answer of the two companies; that is to say:

"In the progress of said matter said Frank P. Blair, superintendent as aforesaid, on December 13th, 1873, filed his motion in said cause, praying said court to order said company to reinsure all the risks held by it in the Mound City Life Insurance Company upon the terms set forth in said motion, and allow him to dismiss his suit as aforesaid. Said terms were that said St. Louis Mutual Life Insurance Company should transfer to said Mound City Life Insurance Company all of its assets, real, personal, or mixed, wheresoever situated, and that in consideration of said transfer said Mound City Life Insurance Company, whose name was afterward changed to the St. Louis Life Insurance Company, should reinsure all risks of said St. Louis Mutual Life Insurance Company, and assume all its liabilities, and should for these purposes increase its capital stock to the sum of $1,000,000, such increase to be secured and paid according to the laws of the State of Missouri, and to the satisfaction of said superintendent. Said motion was duly considered by said court, and was ultimately granted. . . .

"No policy holder of said St. Louis Mutual Life Insurance Company, and no stockholder therein, appeared in opposition thereto, or made any objections, and said arrangement was accordingly fully consummated and carried out according to the terms of said motion.

"And said St. Louis Life Insurance Company in good faith undertook, and is now undertaking, so to carry out said arrangement, and to perform all the terms and conditions, covenants,

promises, and agreements thereof. All the stockholders of the said St. Louis Mutual Life Insurance Company have, in good faith, accepted the said transfer and reinsurance under the order of said court, and a very large majority of its policy holders, to wit, more than 8,000, have surrendered their policies in it, and accepted policies in lieu from the St. Louis Life Insurance Company, which is, moreover, by the terms of its contract with the St. Louis Mutual Life Insurance Company, so approved as aforesaid, directly liable on any and all policies issued by said last mentioned company to the same extent as itself would have been. . . .

"Said contract was made and said transfer and assumption of liabilities executed, and said increase of capital stock made on or before January 17th, 1874."

Lovell, being sworn as a witness in the cause, fully verified all the allegations of the bill, and there was no conflicting evidence. He showed that when he surrendered his policy to be exchanged for a paid-up policy, in April, 1873, it was with the distinct understanding, both of himself and the agent of the company, that he was entitled to, and would receive, a paid-up policy for an amount which the aggregate sum of premiums paid, less the premium note, would purchase if paid as a single premium, and would also receive his premium note; and that the company kept his policy from the time of its surrender in April until after October, and after the company had become insolvent and had been put under injunction, without giving him any notice that he would not receive what he supposed himself entitled to.

The cause came on to be heard before the circuit judge and district judge, holding the Circuit Court of the United States for the Middle District of Tennessee, and the judges differing in opinion upon the questions arising in the case, in accordance with the opinion of the circuit judge, the bill of complaint was dismissed; and the following questions were certified for the opinion of this court, to wit:

" 1st. Whether during the lifetime of complainant, James W.

Lovell, any suit is maintainable upon the policy of life insurance set forth in the record in this case.

"2d. Whether the insolvency of the St. Louis Mutual Life Insurance Company and its contract of reinsurance of December, 1873, with the Mound City Life Insurance Company, accompanied by the transfer of the assets of the former to the latter company, as set forth in the record of this case, operated to confer upon complainants, or either of them, any right of action or suit against the St. Louis Mutual Life Insurance Company, or against the St. Louis Life Insurance Company.

"3d. Whether, if so, complainants can maintain this suit upon this record apart from the other policy holders of said St. Louis Mutual Life Insurance Company, whose policies were in force at the time of said reinsurance transaction, and who, equally with complainants, dissented therefrom."

*Mr. Andrew McClain* for appellants.

*Mr. R. McP. Smith* for appellees.

MR. JUSTICE BRADLEY delivered the opinion of the court. After stating the facts in the foregoing language he continued:

The first and main question is, whether, under all the circumstances, including the insolvency of the company and the transfer of its business to another company, the complainants are entitled to any relief. What they ask is a return of the money actually paid on the policy, with interest, and a surrender of the premium note; but, if not entitled to this relief, are they entitled, under the general prayer, to relief in any form?

We are satisfied that when Lovell surrendered his policy in April, 1873, for the purpose of having it exchanged for a paid-up policy, he exercised a right which the condition of the policy gave him. It is true the precise terms of the condition are, that the policy shall be commuted in case *default* is made in the payment of any premium; but as the making of a default is entirely optional with the insured, it follows that the conversion of the policy from an annual-premium policy to a paid-up policy, is at the option of the insured, at any time after

the payment of the first three annual premiums. Though in no default, he may elect to pay no more premiums, and may give notice to the company to that effect; for it is the exercise of his option against his own interest; since it would be his interest to hold the policy for its whole amount until the maturity of the next premium, and then to make default. But the greater always includes the less. The right to have the policy commuted and reduced to a paid-up policy, by making a default in the payment of a premium, in legal effect includes the right to have it so commuted and reduced by electing at any time to make such default and giving due notice to the company of such election.

At all events, neither the agent of the company, nor the company itself, made any objection to the surrender of the policy at the time when it was actually surrendered for the purpose of exchange.

But it is clear that both Lovell and the agent of the company labored under a mutual mistake as to the amount of the paid-up policy to which Lovell was entitled. They supposed that he was entitled to a paid-up policy for such amount as the sum of the premiums paid (less the premium note) would purchase, if paid as a single premium; whereas the actual stipulation, or condition, was that the sum insured should be commuted or reduced to the amount of the premiums themselves, not the amount of insurance that they would purchase.

Now whilst it is true that the mutual mistake of Lovell and the company's agent could not change the written stipulation, nor bind the company to give Lovell a paid-up policy for a greater amount than the sum of the premiums paid, yet as the mistake was in fact made, and as Lovell surrendered his policy under the influence of that mistake, and, as he testifies, with the distinct understanding that he was to receive a new policy corresponding to such mistaken view, and also to receive his premium note for cancellation, it was the duty of the company, either to have returned him his policy unchanged, or at least to have given him notice of the mistake, so that he might have had an opportunity of determining whether he would still have his policy commuted or not. Good faith required this much

from the company. For, it must be presumed that their agent, in transmitting the policy to the home office for the purpose of being commuted and exchanged, communicated what had passed between him and Lovell on the subject; and, at all events, the communications made by Lovell to the agent were notice to the company.

But nothing of the kind was done. The company neither returned the policy, nor gave Lovell any notice that it would not be commuted for the amount which he supposed and expected it would be; and, of course, he was led to suppose that everything was right, and that he would receive his paid-up policy and note in due time. On the contrary, the company kept the original policy for more than six months—from April until October—until after they had gone or were forced into a process of liquidation, and then some person, designating himself as assignee, made the indorsement on the policy which has been referred to, declaring that, in default of payment of renewal premium due 24th October, 1873, the policy was commuted and reduced to $822, on condition that the interest on outstanding premium notes should be paid annually in advance; and because the interest was not paid on the premium note in April, 1874, the parties having possession of the note, and who had assumed the obligations of the company, declared the policy altogether forfeited, and the complainant entitled to nothing whatever.

It seems to us that the mere statement of the case is enough to show the want of equity in the transaction on the part of the companies, and the right of the complainants to some relief at the hands of the court.

The sum of the matter is this: the complainant surrendered his policy, as he had a right to do, for the purpose of having it commuted to a paid-up policy; but he did so with the understanding between him and the agent of the company that the paid-up policy was to be for such amount as the premiums paid would purchase, and that his premium note should be returned to him. So far as the amount of the paid-up policy was concerned, the complainant and the agent acted under a mutual mistake; but the company kept the policy for six months

without giving the complainant any notice of the mistake, and then, by indorsement on the policy, attempted to reduce it to a different amount, subject to the payment of interest on the premium note, and kept the note instead of delivering it up for cancellation. In the mean time the company conveyed all its assets to another company, and transferred to such other company all its business, and all interest in its outstanding policies, and completely and utterly put it out of its own power to fulfil any of its obligations, and virtually went out of existence.

Under these circumstances we hold, first, that the complainant Lovell, was in no default, and that he did not forfeit his rights under his policy; secondly, that he was under no obligation to continue his insurance, either under his original policy, or under a paid-up policy, with the new company to which the St. Louis Mutual Life Insurance Company transferred its business; thirdly, that since the latter company totally abandoned the performance of the contract made with the complainant, and transferred all its assets and business to another company, and since the contract is executory and continuous in its nature, the complainant had a right to consider the contract as at an end, and to demand what was justly due to him by reason of its abandonment by the company.

Our first conclusion, that the complainant was not in default, and therefore that he forfeited no rights under his policy, is based on the fact that when he elected to have his original policy commuted to a paid-up policy, and surrendered it to the company for that purpose without objection on its part, he had no further duty to perform, and no further premium or interest to pay; and, therefore, he could not make any default. He became entitled to a paid-up policy of some amount or other. If a difference arose between him and the company as to what the amount was, he would have been entitled to change his mind, and take back his original policy. The company being presumably informed, through its agent, of the amount which the complainant considered himself entitled to, should have given him notice, if they did not agree to that amount. They gave him no notice, but assumed to reduce his policy to an amount different from that which he deemed his due, and

retained his note, which he expected to be delivered up to be cancelled; and no notice of this procedure was communicated to the complainant until after the company had been declared insolve:.t, and had placed all of its assets and business out of its hands. We think it clear that the complainant was in no default whatever.

Our second conclusion, that the complainant was under no obligation to continue his insurance in the new company, we think is equally clear. He had nothing to do with that company; it was a stranger to him. It is true that it received all the old company's assets, and assumed all its obligations on policies and otherwise; and the complainant was relegated to the new company for the obtainment of his rights, whatever they were. But that was a transaction between the companies themselves, with which he had nothing to do; and under such a total change of relations and parties, it would be most unreasonable that he should be compelled, against his will, or with the alternative of abandoning all his rights, to continue all his life to fulfil an executory contract by the payment of premiums to a company to which he was a total stranger, and in which, perhaps, he reposed no confidence whatever, or to take a paid-up policy in such company.

Still the complainant might be without other remedy than that of accepting insurance in the new company, or of prosecuting the old and virtually defunct company, if it were not for the fund deposited with the treasurer of Tennessee as indemnity to the citizens of that State holding policies in the company. The assignment of all its assets by the old company to the new one upon the consideration of its obligations being assumed by the new company, is somewhat analogous to an assignment of property by a debtor for the benefit of his creditors, in which only those creditors who are preferred, or those who choose to come in and participate in the fund assigned, receive any benefit, whilst those who refuse to come in take no benefit, preferring to retain their claim against the debtor. So here, if the complainant does not choose to continue his insurance with the new company, he would have no remedy except against the old company (which is totally unable to

VOL. CXI—18

respond) were it not for the fund which has been attached in the hands of the State treasurer of Tennessee. To this fund the complainant, being a citizen of Tennessee, had a right to resort. The object of the laws of Tennessee in requiring the fund to be placed on deposit with the treasurer was to protect and indemnify its own citizens in their dealings with the company. The assignment to the new company in Missouri could not deprive them of the right to this indemnity.

Our third conclusion is, that as the old company totally abandoned the performance of its contract with the complainant by transferring all its assets and obligations to the new company, and as the contract is executory in its nature, the complainant had a right to consider it as determined by the act of the company, and to demand what was justly due to him in that exigency. Of this we think there can be no doubt. Where one party to an executory contract prevents the performance of it, or puts it out of his own power to perform it, the other party may regard it as terminated and demand whatever damage he has sustained thereby. We had occasion to examine this subject in the recent case of *United States* v. *Behan*, 110 U. S. 339, to which we refer. It is unnecessary to discuss it further here.

The question remains as to what is justly due to the complainant in this case, by reason of the contract being terminated by the act of the company. He demands a return of all the premiums paid by him, with interest, less the amount of his premium note; and that said note shall be delivered up to be cancelled. But we do not think that he is entitled to a return of the full amount of his premiums paid. He had the benefit of insurance upon his life for five years, and the value of that insurance should be deducted from the aggregate amount of his payments. In other words, the amount to which the complainant is entitled is, what is called and known in the life insurance business as the value of his policy at the time it was surrendered, with interest, less the amount of his premium note, which should be surrendered and cancelled. The balance due him will be small, but it will be something; and whatever it is, he is entitled to it, as well as to a surrender of his premium

note; and his bill ought not to have been dismissed. The amount due the complainant can easily be ascertained by the court by calling in the aid of an expert, without the trouble and expense of a reference to a master. The equitable value of a policy, according to the age of the insured life at the time it was issued, and the number of years it has run, is shown by the ordinary tables used by every life insurance company, and there can be no difficulty in ascertaining the amount in this case. The point of time for calculating the value will be immediately after the payment of the premium due on the 24th of April, 1873, five years having fully expired, and the first payment being made on the sixth year.

The question has been raised whether the complainant can maintain this suit alone, without bringing in all the other policy holders. We see no reason why not. It does not appear that there are any other policy holders who have not accepted the terms of the arrangement between the two companies, and continued their policies in the new company. Nor does it appear but that the fund now in court is abundantly sufficient to meet all demands upon it in favor of those for whose indemnity it was deposited in the treasurer's office, without any abatement, or the necessity of a pro rata distribution.

Of course, the St. Louis Life Insurance Company is a proper party to this suit, by reason of its claiming the fund attached therein, as part of the assets of the St. Louis Mutual Life Insurance Company assigned to it.

In conclusion, our opinion is, that the following answers should be returned to the questions certified by the judges of the Circuit Court, that is to say:

To the first: That during the lifetime of the complainant, James W. Lovell, a suit is maintainable upon the policy of life insurance set forth in the record, under the circumstances and for the cause stated in this opinion.

To the second: That the insolvency of the St. Louis Mutual Life Insurance Company, and its contract of reinsurance with the Mound City Life Insurance Company, accompanied by the transfer of all its assets to the latter company, as set forth in the record, did operate to confer upon the complainants a

right of action against the said companies as stated in this opinion.

. To the third : That this suit may be maintained upon the record presented therein, apart from the other policy holders of the St. Louis Mutual Life Insurance Company.

It follows that

*The decree of the Circuit Court must be reversed, and the cause remanded for further proceedings in accordance with this opinion ; and it is so ordered.*